# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| RAINWORKS LIMITED, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:06CV1549 |
| | ) | |
| v. | ) | Judge Christopher Boyko |
| | ) | |
| THE MILL-ROSE COMPANY, et al. | ) | Magistrate Judge Perelman |
| | ) | |
| Defendants. | ) | |

**DEFENDANT THE MILL-ROSE COMPANY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT, INVALIDITY, AND UNENFORCEABILITY OF THE '068 DESIGN PATENT; NO BREACH OF CONTRACT; AND NO TORTIOUS INTERFERNCE WITH CONTRACT**

Brian E. Turung (0052034)
Jude A. Fry (0053651)
FAY SHARPE LLP
1100 Superior Avenue, 7th Floor
Cleveland, Ohio 44114-2579
Phone: (216) 861-5582
Fax: (216) 241-1666
E-Mail: bturung@faysharpe.com
jfry@faysharpe.com

Attorneys for Defendant
The Mill-Rose Company

**TABLE OF CONTENTS**

I.    SUMMARY JUDGMENT STANDARD ............................................................................ 1

II.   THE ACCUSED MILL-ROSE PRODUCT DOES
      NOT INFRINGE THE '068 DESIGN PATENT............................................................... 2

      A.    Design Patent Infringement ..................................................................................3
            1.    Construction of the Patented Design.........................................................5
            2.    The Accused Mill-Rose Brush...................................................................7
      B.    The Ordinary Observer Test ..................................................................................8
      C.    The Points of Novelty Test ...................................................................................9

III.  THE '068 DESIGN PATENT IS INVALID FOR FAILING TO
      SATISFY THE REQUIREMENTS OF 35 U.S.C. §171 ..................................................... 11

      A.    The Design is Primarily Functional .....................................................................12

IV.   THE '068 DESIGN PATENT IS UNENFORCEABLE FOR PLAINTIFFS'
      FRAUDULENT SUBMISSION BEFORE THE U.S. PATENT AND TRADEMARK
      OFFICE ....................................................................................................................... 15

V.    NO BREACH OF CONTRACT BY MILL-ROSE ........................................................... 16

      A.    General Contract Principles .................................................................................16
      B.    Mill-Rose Did Not Violate The CDA....................................................................16
            1.    The Provisions of the CDA.....................................................................16
            2.    The Alleged Confidential Information Provided to Mill-Rose...........................17
                  a.    Bristle Composition of the
                        Hedgehog™ Gutter Filter ......................................................... 19
                  b.    Application of Sealant to
                        Ends of the Hedgehog™ Gutter Filter ...................................... 20
                  c.    Lateral Trimming of the Hedgehog™ Gutter Filter
                        and a Method of Lateral Trimming.......................................... 21
                  d.    Profile Packaging, Carton Loading, Use of Horizontal
                        Hopper, Fixing System and Branding and Bar Coding ............................ 23

i

VI. MILL-ROSE DID NOT TORTIOUSLY INTERFERE WITH A CONTRACT ................. 25

   A.    Tortious Interference Standard ................................................................25

   B.    History of Contract ................................................................................26

   C.    Mill-Rose's Contract with GPI Occurred
        After License Agreement was Terminated ...............................................27

   D.    Mill-Rose Had No Knowledge of Contract ..............................................28

   E.    Mill-Rose Did Not Intentionally Procure the Breach of the Contract .........28

VII. CONCLUSION .............................................................................................. 30

ii

# TABLE OF AUTHORITIES

**Cases**

*A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,*
73 Ohio St.3d 1, 651 N.E.2d 1283 (Ohio 1995) .......................................................................26

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ..................................................................................................................2

*Berry Sterling Corp. v. Pescor Plastics, Inc.,*
122 F.3d 1452 (Fed. Cir. 1997)................................................................................................12

*Celotex Corp. v. Catrett, All,*
477 U.S. 317 (1986)................................................................................................................2, 3

*Chesher v. Neyer,*
392 F.Supp.2d 939 (S.D.Ohio 2005) ......................................................................................26

*Chore-Time Equip., Inc. v. Cumberland Corp.,*
713 F.2d 774 (Fed. Cir. 1983)....................................................................................................2

*Contessa Food Prods., Inc. v. Conagra, Inc.,*
282 F.3d 1370 (Fed. Cir. 2002)..............................................................................................4, 8

*Dryden v. Cincinnati Bell Tel. Co.,*
135 Ohio App.3d 394, 734 N.E.2d 409 (Ohio Ct. App. 1999) ................................................26

*Elmer v. ICC Fabricating, Inc.,*
61 F.3d 1571 (Fed. Cir. 1995)....................................................................................................3

*Gorham Co. v. White,*
81 U.S. (14 Wall.) 511 (1871) ...................................................................................................4

*Harris v. General Motors Corp.,*
201 F.3d 800, 802 (6th Cir.2000) ..............................................................................................2

*Herbert v. Lisle Corp.,*
99 F.3d 1109 (Fed. Cir. 1996)..................................................................................................16

*In re Carletti,*
328 F.2d. 1021 (Fed. Cir. 1964)...............................................................................................12

*Kenty v. Transamerica Premium Ins. Co.*,
72 Ohio St.3d 415, 650 N.E.2d 863 (Ohio 1995) ............................................................26, 28, 29

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*,
988 F.2d 1117 (Fed. Cir. 1993).........................................................................................12

*Landskroner v. Landskroner*,
2005-Ohio-4582 (Ohio Ct. App. 2005)..............................................................................26

*Litton Systems, Inc. v. Whirlpool Corp.*,
728 F.2d 1423 (Fed. Cir. 1984).......................................................................................4, 10

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995)...............................................................................................3

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 586 (1986)....................................................................................................2

*Norian Corp. v. Stryker Corp.*,
363 F.3d 132 (Fed. Cir. 2004)...........................................................................................15

*OddzOn Prods., Inc. v. Just Toys, Inc.*,
122 F.3d 1396 (Fed. Cir. 1997)....................................................................................3, 5, 8

*Power Controls Corp. v. Hybrinetics, Inc.*,
806 F.2d 234 (Fed. Cir. 1986)...........................................................................................11

*Scharmer v. Carrollton Mfg. Co.*,
525 F.2d 95 (6th Cir. 1975) ..............................................................................................21

*Sun Hill Indus., Inc. v. Easter Unlimited, Inc.*,
48 F.3d 1193 (Fed. Cir. 1995)...........................................................................................11

*Unidynamics Corp. v. Automatic Prods. Int'l, Ltd.*,
157 F.3d 1311 (Fed. Cir. 1998)............................................................................................4

*Winner Int'l Corp. v. Wolo Mfg. Corp.*,
905 F.2d 375 (Fed. Cir. 1990)........................................................................................5, 9

**Statutes**

35 U.S.C. §171...................................................................................................11, 14, 30

**Rules**

Fed. R. Civ. P. 56(c) ...............................................................................................1

Fed. R.Civ. P. 56(e) ...............................................................................................2

Defendant, the Mill-Rose Company ("Mill-Rose"), submits this memorandum in support of its motion for summary judgment of non-infringement, invalidity, and unenforceability of U.S. Patent No. Des. 381,068 ("the '068 patent"); no breach of contract; and no tortious interference with contract.

Plaintiffs, Rainworks Limited ("Rainworks") and Michael Herdman ("Herdman") have alleged that a) Mill-Rose infringes the '068 patent by manufacturing a certain brush product ("the Mill-Rose brush") for Gutterpiller, Inc. ("GPI"); b) Mill-Rose breached a Confidential Disclosure Agreement ("CDA") by i) disclosing and using, without authorization, confidential information that related to the Hedgehog™ gutter filter and ii) misappropriating the intellectual property and other rights of the Hedgehog™ gutter filter; and c) Mill-Rose intentionally interfered with a contract between Rainworks and Amerisales, Inc. ("Amerisales").

As will be conclusively established below, a) the Mill-Rose brush does not infringe the claim of the '068 patent; b) the design illustrated and claimed in the '068 patent does not include any patentable ornamental features; c) the '068 patent should be held unenforceable due to Plaintiffs' fraudulent submission before the U.S. Patent and Trademark Office; d) Mill-Rose did not violate any provision of the CDA; and e) Mill-Rose did not interfere with any contract between Rainworks and Amerisales.  As such, Mill-Rose is entitled to summary judgment on Counts 1, 8 and 12 of the Amended Complaint.

## I.      SUMMARY JUDGMENT STANDARD

Disposition of an action by summary judgment is proper where there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

1

The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) ( *quoting* Fed.R.Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324; *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## II.   THE ACCUSED MILL-ROSE PRODUCT DOES NOT INFRINGE THE '068 PATENT

Summary judgment is appropriate in patent infringement cases. *Chore-Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774, 778-79 (Fed. Cir. 1983). The burden imposed on the party seeking summary judgment depends on whether the moving party would have the burden of proof

2

at trial on the issue presented. In this instance, Plaintiffs carry the burden of proving that the Mill-Rose brush infringes the claim of the '068 patent. Accordingly, Mill-Rose can discharge its burden on summary judgment by showing merely a lack of some evidence needed to support Plaintiffs' infringement count, *i.e.*, "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 at 325.

In the context of summary judgment of non-infringement of a design patent, Mill-Rose's burden would be met by showing that Plaintiffs cannot prove infringement under either the "ordinary observer" test or the "point of novelty" test. As will be shown below, Mill-Rose is entitled to summary judgment of non-infringement under ***both*** tests.

### A.      Design Patent Infringement

A determination of whether a design patent is infringed is a two-step analysis.

> Determining whether a design patent has been infringed requires, first, as with utility patents, that the claim be properly construed to determine its meaning and scope. Second, the claim as properly construed must be compared to the accused design to determine whether there has been infringement.

*Elmer v. ICC Fabricating, Inc., 61* F.3d 1571, 1577 (Fed. Cir. 1995).

An important principle that guides claim construction for a design patent is that "[a] design patent only protects the novel, ornamental features of the patented design. Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *OddzOn Prods., Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1405 (Fed. Cir. 1997). Claim construction is an issue of law that must be determined by the court. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996).

3

The step of comparing the claimed design to the accused article is itself a two-part test. The first part is the "ordinary observer" test enunciated by the Supreme Court in *Gorham Co. v. White,* 81 U.S. (14 Wall.) 511 (1871):

> [I]f, in the eye of the ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Id.* at 528.

This comparison must take into consideration the entirety of the design shown in the patent's drawings. "[T]he 'ordinary observer' analysis is not limited to the ornamental features of a subset of the drawings, but instead must encompass the claimed ornamental features of all figures of a design patent." *Contessa Food Prods., Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1379 (Fed. Cir. 2002).

The second part of the infringement analysis is the "point of novelty" test, as articulated by the Federal Circuit in *Litton Systems, Inc. v. Whirlpool Corp.,* 728 F.2d 1423 (Fed. Cir. 1984):

> For a design patent to be infringed, however, no matter how similar two items look, "the accused device must appropriate the novelty in the patented device which distinguishes it from the prior art." That is, even though the court compares two items through the eyes of the ordinary observer, it must nevertheless, to find infringement, attribute their similarity to the novelty which distinguishes the patented device from the prior art.

*Id.* at 1444.

The point of novelty test is "distinct" from and imposes a requirement "in addition to" that of the ordinary observer test. *Unidynamics Corp. v. Automatic Prods. Int'l, Ltd.,* 157 F.3d 1311, 1323 (Fed. Cir. 1998). The Federal Circuit has stated categorically that failing to apply the point of novelty test is legal error. "To consider the overall appearance of a design without regard to prior art would eviscerate the purpose of the 'point of novelty' approach, which is to focus on those aspects

of a design which render the design different from prior art designs." *Winner Int'l Corp. v. Wolo Mfg. Corp.,* 905 F.2d 375, 376 (Fed. Cir. 1990).

Because both the ordinary observer test and the point of novelty test must be satisfied for design patent infringement to occur, Mill-Rose must prevail on its motion for summary judgment of non-infringement if either test is not satisfied. As shown below, neither test is satisfied.

### 1.      Construction of the Patented Design

The '068 patent is entitled "Gutter Filter" (Ex. A) and is directed to a useful article, not a purely ornamental design.  Accordingly, the design must be construed to eliminate the functional aspects. *OddzOn Products,* 122 F.3d at 1405.  As will be shown below, all of the aspects of the design shown in the '068 patent are entirely functional. Therefore, after the requisite construction, there is nothing left to the claimed design.

The "gutter filter" design of the '068 patent illustrated in Figure 1-3[1] can be described as having a body portion including a plurality of bristles arranged in a helical fashion about a twisted wire spine[2].  Notably, the body includes a laterally trimmed bristle portion or "flat" extending lengthwise and generally parallel to the wire spine.  A side view of the gutter filter, as shown in Figure 1 of the '068 patent, illustrates the trimmed bristle portion laterally offset to the left from a centerline defined along the wire spine.  The trimmed bristle portion is also clearly visible in the end view of Figure 2 of the '068 patent.  As a result of the laterally trimmed bristle portion, the end profile or cross section of the gutter filter is generally semi-circular.

---

[1] The three Figures of the '068 patent discloses a single embodiment of a gutter filter.

[2] The claim of the '068 patent is not limited to any specific size, length or composition of gutter filter.

All the features of the gutter filter body are exclusively utilitarian and purely functional features of the gutter filter design of the '068 patent. These features of the gutter filter are designed to enable the gutter filter to be properly positioned in a gutter and to maximize the filtration efficiency of the gutter filter when in the gutter.

The gutter filter is the plurality of bristles on the spine of the gutter filter. These bristles are used to prevent foreign objects from falling into or amassing in a roof gutter while the gutter filter is positioned in the gutter. The bristles are also used to filter out debris in the water flowing through the gutter filter while the gutter filter is positioned in the gutter. The bristles are further used to maintain the gutter filter in the gutter.

The twisted wire spine is used to provide an effective and inexpensive technique for retaining bristles in a helical and centered configuration about the centerline or longitudinal axis of the wire spine.

The trimmed bristles ensure that the gutter filter has the proper profile to fit in a gutter. The trimming of the bristles also results in an increased contact area between the gutter filter and the inner wall surface of a gutter to enable the trimmed bristles to rest against the inner wall surface of the gutter (e.g., the inner bottom surface), thereby enabling the gutter filter to more effectively and efficiently strain or filter water flowing through the gutter. By contrast, a gutter filter without the trimmed bristle portion would have fewer bristles in contact with an inner wall surface of the same gutter, thus adversely affecting the filtration function of the gutter filter in the gutter. The trimmed bristle portion also ensures that the gutter filter fits "snugly" against the base of the gutter so that the top of the gutter filter is maintained below a roof overhang, thereby facilitating in anchoring the gutter filter in the gutter. Plaintiffs' own literature and correspondence detail these functional

6

advantages of the trimmed bristles and derived benefits. (Ex. B-F).

As set forth above, the overall appearance of the gutter filter shown in the '068 patent is dictated solely by the purpose of the article--to properly fit the profile of a gutter, to prevent debris from falling into the gutter while water runs off the roof into the gutter, and to filter out any debris in the water as the water travels horizontally through the gutter filter while the gutter filter is positioned in the gutter.  In this regard, the gutter filter must include a) a twisted spine to retain the plurality of bristles in a helical or spiral configuration about the centerline or longitudinal axis of the gutter filter and b) a trimmed bristle portion so that the gutter filter properly fits into the profile of the gutter.  Once the functional aspects of the '068 patent have been removed, there are no other features left to the claimed design.

### 2.    The Accused Mill-Rose Brush

The Mill-Rose brush includes a generally cylindrical body having a plurality of bristles helically arranged about a twisted wire spine. (Ex. G).  The Mill-Rose brush <u>does not</u> include any lateral trimming of the bristles so as to create a "flat" contact area.  As such, when the Mill-Rose brush is viewed from an end perspective, the space occupied by the bristles defines a cylinder having a <u>circular</u> cross-section.  By contrast, and as discussed previously, the bristles of the gutter filter design of the '068 patent occupy a space defining an irregular cylinder having a generally <u>semi-circular</u> cross section.

A comparison of the properly construed design claim of the '068 patent to the undisputed shape of the Mill-Rose brush compels the conclusion that the Mill-Rose brush does not infringe the '068 patent, thus Mill-Rose is entitled to summary judgment of non-infringement.

7

### B.      The Ordinary Observer Test

Where, as here, Plaintiffs' gutter filter design is not a purely ornamental design, infringement under the ordinary observer test requires that Plaintiffs "establish that an ordinary person would be deceived by reason of the common features in the claimed and accused designs that are ornamental," *OddzOn Products,* 122 F.3d at 1405.  The test also requires that the "claimed design" be defined by all of the drawings of the design patent at issue. *Contessa Food,* 282 F.3d at 1378-79.

The Mill-Rose brush does not include any of the features of the design claimed by the '068 patent after the requisite exercise in claim construction eliminates from consideration the functional aspects of the design as claimed by the '068 patent.  Moreover, a direct comparison of the drawings of the '068 patent with the Mill-Rose brush demonstrates that the overall design claimed by the '068 patent is substantially different from the appearance of the Mill-Rose brush.  Furthermore, the Mill-Rose brush and the gutter filter design of the '068 patent do not share any ornamental features, assuming that such ornamental features even exist in the '068 patent.

Reproduced below is an end view of the Mill-Rose brush (Ex. G) and the corresponding end view of the gutter filter design illustrated in Figure 2 of the '068 patent (Ex. A).

U.S. Patent          Jul. 15, 1997        Sheet 2 of 2          Des. 381,068




FIG. 2

8

A direct comparison of the '068 patent with the Mill-Rose brush, as viewed from similar perspectives, demonstrates that the overall design claimed by the patent is substantially different from the appearance of the Mill-Rose brush. The design shown in the drawings of the '068 patent includes a laterally trimmed bristle portion, whereas this feature is entirely missing from the Mill-Rose brush. This difference alone precludes infringement under the ordinary observer test.

If the hypothetical "ordinary observer" were to view the claimed design of the '068 patent and the design of the Mill-Rose brush side-by-side as shown above, Mill-Rose submits that no reasonable observer would find them substantially the same or be deceived into purchasing one based on the belief that it was the other's design. Moreover, when one considers only the non-functional, ornamental features of the two designs (to the extent such features exist), the ordinary observer test cannot be satisfied because there are no ornamental features to compare.

As Plaintiffs cannot meet the burden of proving infringement under the ordinary observer test, the Court should grant Mill-Rose's motion for summary judgment of non-infringement on the basis of this test alone.

### C.     The Points of Novelty Test

The purpose of the Point of Novelty test "is to focus on those aspects of a design which render the design different from prior art designs." *Winner v. Wolo,* 905 F.2d at 376. To assist the Court in applying the point of novelty test, Mill-Rose has submitted a number of prior art patents as Exhibit H. To the extent the gutter filter shown in the drawings of the '068 patent incorporates features shown in these prior art patents, those features are not novel.

The prior art patents clearly illustrate that generally cylindrical twisted wire brushes were well known prior to the filing of the '068 patent. By comparing the prior art wire brush designs to

9

that of the '068 patent, it is readily apparent that the laterally trimmed bristle portion is the only distinguishing feature or arguable point of novelty of the '068 patent. Furthermore, by comparing the only arguable point of novelty of the '068 patent to the Mill-Rose brush, it is evident that the trimmed bristle portion feature is simply not appropriated by the Mill-Rose brush.

The patents set forth in Exhibit H are all examples of prior art brush/filter designs that include a body having plurality of bristles wound about a twisted wire spine. For example, U.S. Pat. No. 201,688 to Leiner (which issued on March 26, 1878) teaches, with respect to Figure 2, that "…A represents a brush which is constructed in the well-known manner, by binding off the bristles in twists of stiff wire strands, so that a round brush, with spirally-arranged tufts of bristles, is obtained…" Similarly, with reference to Figure 1 of U.S. Pat. No. 488,784 to Zolper (which issued on December 27, 1892), the concept of a helically or spirally wound bristle brush having a twisted wire spine is also disclosed. British reference GB 537, 017 (which published on June 5, 1941), discloses a filtering arrangement that uses "…brush members of the kind known as 'twisted bristle brushes' which comprise bristles extending radially outwardly from all sides of a stem element which is preferably composed of two lengths of wire twisted together…" (P. 4, lns. 94-97, Figs. 1-5). The other remaining prior art patents set forth in Exhibit H further illustrate that brushes having a twisted wire spine with bristles arranged to form a generally cylindrical brush profile were well known prior to the filing of the '068 patent.

Thus, taken altogether, these patents disclose many variations in twisted bristle brush designs, confirming that this is a crowded field requiring the claimed design to be construed narrowly. *See Litton,* 728 F.2d at 1444.

To prevail on an infringement claim under the point of novelty test, Plaintiffs must show that

10

the accused product appropriates a ***novel*** feature of the design, that is, a feature not present in any of these prior art examples. The only arguably novel feature to which Plaintiffs could point to is the laterally trimmed bristle portion that extends lengthwise along the gutter filter of the patented design. The Mill-Rose brush does not include this laterally trimmed bristle feature. Furthermore, because the only arguable point of novelty of a laterally trimmed bristle portion is entirely missing and not appropriated by the Mill-Rose brush, the doctrine of equivalents is not applicable. *Sun Hill Indus. v. Easter Unlimited, Inc.*, 48 F.3d 1193, 1199 (Fed. Cir 1995).

In view of the fact that the Mill-Rose brush does not incorporate the only arguable point of novelty of the '068 patent, Plaintiffs cannot meet the burden of proving infringement under the point of novelty test. As such, Mill-Rose is entitled to summary judgment of non-infringement on the basis of the point of novelty test alone.

## III.  THE '068 PATENT IS INVALID FOR FAILING TO SATISFY THE REQUIREMENTS OF 35 U.S.C. §171

Mill-Rose is entitled to summary judgment of invalidity of the '068 patent since the '068 patent is invalid for being merely a functional design.

Patented designs which are primarily functional, rather than ornamental, are invalid. *Power Controls Corp. v. Hybrinetics, Inc.*, 806 F.2d 234, 238 (Fed. Cir. 1986). The requirement that a patented design have ornamental features is set forth in 35 U.S.C. §171 which provides:

> Whoever invents any new, original and *ornamental design* for an article of manufacture may obtain a patent therefor, subject to the conditions of this title. The provisions of this title relating to patents for inventions shall apply to patents for *designs*, except as otherwise provided. (Emphasis added).

The Court of Customs and Patent Appeals eloquently discussed the need for ornamental features in a design patent as follows:

11

Many well-constructed articles of manufacture whose configurations are dictated solely by function are pleasing to look upon ... But it has long been settled that when a configuration is a result of functional considerations only, the resulting design is not patentable as an ornamental design for the simple reason that is it not "ornamental" – was not created for the purpose of ornamenting. [Citations omitted.]

*In re Carletti*, 328 F.2d 1020, 1022 (Fed. Cir. 1964).

As such, "the design of a useful article is deemed to be functional when the appearance of the claimed design is 'dictated by' the use or purpose of the article" and that "if the particular design is essential to the use of the article, it cannot be the subject of a design patent." *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993).[3]

## A.    The Design is Primarily Functional

When the overall design of the '068 patent is viewed in its entirety, it is evident that the gutter filter of the '068 patent is dictated by its utilitarian purpose, namely, to properly fit in a gutter so as to filter out debris from rain water collected in a roof gutter and to prevent debris from entering the gutter. The only distinguishing aspect of the design of the '068 patent from the prior art (or the point of novelty) is the trimmed bristle or flat of the brush. The design of the gutter filter in the '068 patent lacks any other novel feature or element whose overall appearance is not purely dictated by function.

The entire rationale for trimming the gutter filter has nothing to do with the overall ornamentality of the gutter filter. The trimming of the gutter filter is used to enable the gutter filter to properly sit in a roof gutter. Plaintiffs, when describing or advertising the Hedgehog™ gutter

---

[3]A number of considerations can be used to determine if a design is primarily functional or ornamental: 1) the existence of alternative designs; 2) whether the protected design represents the best design; 3) whether alternative designs would adversely affect the utility of the specified article; 4) whether there are any concomitant utility patents; 5) whether the advertising touts particular features of the design as having specific utility; and 6) whether there are any elements in the design or overall appearance clearly not dictated by function. *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1456 (Fed. Cir. 1997).

filter to third parties, only described the advantages for trimming the bristles on the gutter filter.  For example, Plaintiffs' letter dated March 12, 1997 to Mill-Rose (Ex. I) characterized the "Hedgehog" gutter filter as similar in appearance to a "crudely made lop-sided bottle brush" and stated that the "rationale behind the 'lop-sided', or … 'crew-cut' bristle profile is…critical to the fit and performance of the product."  It is very telling that when Plaintiffs first introduced the Hedgehog gutter filter to Mill-Rose, the stated reasons for the trimming of the gutter filter were only utilitarian, not ornamental.[4]

Plaintiffs' product and advertising literature feature utilitarian or functional aspects of the gutter filter. (Ex B-F).  For example, Plaintiffs' product literature includes statements regarding a) the "unique patented bristle profile" of the Hedgehog ensures that the Hedgehog fits "snugly against the gutter floor" so as to filter the water prior to flowing into the gutter downpipes and/or prevent leaves or other unwanted objects in the gutter and b) the "crew cut base also lowers the overall height of the filter sufficiently for the upper bristles to anchor the Hedgehog under the roofing overhang." (Ex. D). Plaintiffs' product literature also makes it clear that "without the crew cut base, the height/width ratio would be lost, as would the snug fit against the gutter floor which contributes so much to the Hedgehog's efficiency." (Ex. D).

Plaintiffs have even asserted in paragraph 12 of the Amended Complaint that the Hedgehog's "…unique features include lateral trimming, which enables brushmakers to custom make filters to fit virtually any kind of gutter profile, and which was something that had not been incorporated in twisted-in-wire brushware before the Hedgehog.™"  Plaintiffs' Interrogatory responses (Ex. J)

---

[4]Plaintiffs also touted the importance of the bristle profile several years later when describing the product to Amerisales, Inc. in a letter dated January 3, 2001. (Ex. F).  Plaintiffs have only recently asserted that the trimmed portion is aesthetic and ornamental. (Ex. L - Pgs. 70-71; 96-97).

include similar statements about the functional nature of the trimmed bristles:

> Lateral Trimming and Method of Manufacturing. *To promote a better fit of the filter to the profile of the gutter, to increase bristle density and filter performance*, and to decrease freight charges, the filter is trimmed using horizontally mounted scissor cutters mounted behind a cutting comb (which prevents the angled bristles from slipping away from the cutter blades). *Depending upon the profile of the gutter, one or two sides of the filter is trimmed to promote a better fit. Trimming can also be done to accommodate the primary purpose of a filter (i.e., screening debris or keeping out rodents and birds)...* (Emphasis added)

> The unique features disclosed in US Patent No. Des. 381,068 are the bristles, the purpose of the bristles, the modular concept, *and how the shape of the filter can be modified through lateral trimming so as to suit the profile of the gutter.*" (Emphasis added)

> *Depending upon the gutter profile, Hedgehog gutter filters may be laterally trimmed at two different locations...*" (Emphasis added)

Based on Plaintiffs' admissions in this civil action, it is evident that the only arguable point of novelty (i.e., the laterally trimmed bristle portion) that purportedly distinguishes Plaintiffs' gutter filter from the prior art, is entirely dictated by its purpose to permit the gutter filter to fit properly in a gutter so that the gutter filter can efficiently filter out debris when positioned in the gutter. Plaintiffs' product brochures and literature only confirm this fact. Plaintiffs' admissions and literature make it clear that the gutter filter design in the '068 patent is optimal for filtering rainwater in the gutter and for properly positioning the gutter filter in a gutter. Thus, not trimming the bristles would adversely affect the utility of the gutter filter.

Accordingly, the gutter filter of the '068 patent is entirely a functional configuration for a brush to be positioned in a roof gutter. As such, the '068 patent does not meet the requirements of 35 U.S.C. §171, thus Mill-Rose, as a matter of law, is entitled to summary judgment of invalidity.

14

## IV.   THE '068 PATENT IS UNENFORCEABLE FOR PLAINTIFFS' FRAUDULENT SUBMISSION BEFORE THE PATENT OFFICE

A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, does not disclose material information or *submits materially false information* to the PTO during prosecution. *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1330-31 (Fed. Cir. 2004).

Herdman filed a United States patent application for the design of his gutter filter on July 12, 1995. (Ex. A).  Herdman also signed a declaration for his patent application. (Ex. K).  Under oath, Herdman made the following declaration:

> I hereby state that I have reviewed and understand the contents of the above-identified specifications, including the claims, as amended by any amendment referred to above.

Herdman admitted during his deposition that the drawings used in his US patent application may not be representative of his gutter filter design. (Ex. L - Pgs. 214-221).[5]  Irrespective of such concerns, Herdman declared otherwise under oath when filing his US patent application.  Herdman also testified that he did not **see or approve** of Figure 3 of the '068 patent prior to filing the '068 patent. (Ex. L - Pgs. 214-222).

Herdman's testimony establishes that he signed a declaration under oath for a US patent application irrespective of the fact that a) Figures 1-3 of the '068 patent were not accurate representations of his gutter filter and b) Figure 3 was not an approved drawing.  Herdman's excuses that he signed whatever his attorney gave him to sign (Ex. L - Pgs. 221-222) or that he relied on his

---

[5]Herdman stated he attended a trade school, earned an engineering certificate, considered himself an engineer, and drafted design or machine drawings during his career, thus was well qualified to determine whether the figures in the '068 patent were truly representative of his gutter filter . (Ex. L – Pgs. 10-12; 24-25; 210-211; 218).

attorney's "superior" knowledge as to the figures that should be filed with his patent application (Ex. Lat 215:7-217:10), does not absolve Herdman of his misrepresentations before the US Patent Office.

Herdman's admitted misrepresentations before the US Patent Office constitute inequitable conduct or fraud, thereby resulting in the unenforceability of the '068 patent. ("A holding of unenforceability based on the filing of a false oath requires that the oath was false, and made with knowledge of the falsity..." *Herbert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996)).

Accordingly, because Herdman made intentional misrepresentations before the US Patent Office at the time his patent application was filed, the '068 patent is unenforceable so that Mill-Rose, as a matter of law, is entitled to summary judgment of unenforceability.

## V.     NO BREACH OF CONTRACT BY MILL-ROSE

### A.     General Contract Principles

In the context of summary judgment of a non-breach of contract, Mill-Rose's burden is met by showing that either a) Mill-Rose did not use any confidential information of Rainworks or b) Mill-Rose used or disclosed information that was already in the public domain. As will be shown below, Mill-Rose is entitled to summary judgment of non-breach of contract in both instances.

### B.     Mill-Rose Did Not Violate The CDA

After construing the provisions of the CDA and the state of the art regarding brushes at the time Mill-Rose began manufacturing brushes for GPI, the Court should conclude, as a matter of law, that Mill-Rose did not violate any provision of the CDA and that Mill-Rose is entitled to summary judgment.

#### 1.     The Provisions of the CDA

Rainworks approached Mill-Rose in 1997 to determine whether Mill-Rose would be

16

interested in manufacturing and selling a brush for use in a gutter that was named the "Hedgehog™."

Prior to providing Mill-Rose with any detailed information, Rainworks required Mill-Rose to sign

a CDA. The CDA was signed by Victor Miller, former president of Mill-Rose, on February 26,

1997. (Ex. M).

Clause 3 of the CDA defines what is considered confidential information:

3.    Subject to Clause 7, all information concerning the product, including information provided to The Mill-Rose Company by Rainworks Limited and the evaluation made by The Mill-Rose Company is confidential information. The term "product" is defined in the "Definitions" section under paragraph 1 as "The Hedgehog Gutter Filter," the "Leaf Guard," and the "Bird Barrier."

Clause 7 of the CDA sets limits on the confidential information:

7.    'Confidential Information' does not include -
a) Information that as of the date of receipt by The Mill-Rose Company is in the public domain in the United States of America or subsequently enters the public domain in the United States of America without fault on the part of Mill-Rose Company.

b) Information that at the time of receipt by The Mill-Rose Company was known to The Mill-Rose Company as evidenced by presently existing documents.

c) Information that at any time is received in good faith by Mill Rose Brush Company from a third party lawfully in possession of the information who had the right to disclose the information.

As will be established below, any information provided by Rainworks to Mill-Rose in 1997

fell within one or more of the exceptions set forth in Clause 7 of the CDA by the time Mill-Rose

began manufacturing brushes for GPI in late 2002-early 2003.

**2.    The Alleged Confidential Information Provided to Mill-Rose**

The Amended Complaint does not specifically identify what types of confidential information

Mill-Rose allegedly disclosed, used or misappropriated. These details were subsequently provided

by Plaintiffs when responding to a Mill-Rose Interrogatory Request (Ex. J - Interrogatory. No. 1).[6]

The evidence of record establishes that much of the alleged confidential information was never provided to Mill-Rose in 1997. After Mill-Rose signed the CDA, Mill-Rose received a letter dated March 12, 1997 (Ex. I) and a sample of the Hedgehog™ gutter filter (Ex. N). The March 12th letter described the design of the Hedgehog™ gutter filter, and also indicated that such design was protected by an "American Patent." The letter also made reference to the color and general composition of the bristles of the Hedgehog™ gutter filter. A brochure (Ex. B) was included with the March 12, 1997 letter. The brochure included information about various aspects of the Hedgehog™ gutter filter.

Herdman sent Mill-Rose two further letters dated April 15, 1997 and April 28, 1997 (Ex. O-P) that provided additional information regarding the composition of the bristles of the Hedgehog™ gutter filter, packaging the Hedgehog™ gutter filter in a "3 pack," and packaging the Hedgehog™ gutter filter in cardboard boxes that included color illustrations which depicted the advantages of the Hedgehog™ gutter filter. Several additional exchanges took place between Mill-Rose and Rainworks regarding the type of gutter filter samples Mill-Rose had made for the 1997 Chicago Hardware show (Ex. Q-S), and the use of clips with the Hedgehog™ gutter filter (Ex. T). During Herdman's meeting with Mill-Rose in 1997, Herdman could not recall whether any type of packaging for the Hedgehog™ gutter filter was ever provided to Mill-Rose. (Ex. L at 245:15-246:7).

---

[6]Plaintiffs alleged that Mill-Rose was provided confidential information regarding 1) bristle composition of the Hedgehog™ gutter filter, 2) application of a sealant to the ends of the Hedgehog™ gutter filter, 3) lateral trimming of the Hedgehog™ gutter filter and a method for lateral trimming, 4) profile packaging of the Hedgehog™ gutter filter, 5) carton loading of the Hedgehog™ gutter filter, 6) the use of horizontal hoppers, 7) a fixing system for securing the Hedgehog™ gutter filter in awkward locations, and 8) branding and bar coding the Hedgehog™ gutter filter.

Based on the documentary evidence of record and the testimony provided by Plaintiffs, there is <u>no</u> evidentiary support for the assertions by Plaintiffs that Mill-Rose was provided confidential information regarding 1) profile packaging of the Hedgehog™ gutter filter, 2) carton loading of the Hedgehog™ gutter filter, 3) use of horizontal hoppers, 4) a fixing system for securing the Hedgehog™ gutter filter in awkward locations, and 5) branding and bar coding the Hedgehog™ gutter filter. Further, any alleged confidential information provided by Plaintiffs to Mill-Rose in 1997 fell within one or more of the exceptions set forth in Clause 7 of the CDA by the time Mill-Rose began manufacturing gutter filters for GPI in late 2002-early 2003.

### a. Bristle Composition of the Hedgehog™ Gutter Filter

Rainworks, in letters dated March 12, 1997 (Ex. I ), April 15, 1997 (Ex. O), and April 28, 1997 (Ex. P), informed Mill-Rose that the bristles used on the Hedgehog™ gutter filter were black bristles made of polypropylene that resisted UV rays and that the addition of carbon to the bristle "prevents light from entering the bristle filament."

Mill-Rose manufactured several gutter filter samples that were displayed at the 1997 Chicago Hardware show. (Ex. L at 114:17-116:10; Ex. U). These sample gutter filters included black bristles made of polypropylene. As such, after the 1997 Chicago Hardware show, the use of black polypropylene bristles on a gutter filter was in the public domain.

Prior to the time GPI contacted Mill-Rose in late 2002, GPI had been advertising and selling gutter filters in the United States under the GUTTERPILLER brand since 2001. (Ex. V at 16:22-17:4; Ex. W). These gutter filters used UV protected polypropylene bristles. (Ex. V at 15:16-18). Such sales of GPI gutter filters in 2001 and 2002 further establish that gutter filters having black

bristles made of polypropylene which resisted UV rays were in the public domain prior to the time Mill-Rose began manufacturing gutter filters for GPI. Furthermore, Plaintiffs' own advertising literature discloses that UV polypropylene bristles are used on the gutter filters. (Ex. B).

As to the use of carbon in the bristles, Mill-Rose is unaware of using such bristles on the gutter filters manufactured for GPI. (Ex. X at 127:21-129:5, 136:22-137:24, 144:8-145:21, 203:18-204:13; Ex. U). Indeed, Plaintiffs admit that they have no idea what bristle composition is used by Mill-Rose. (Ex. L at 263:16 -24).

In summary, any supposedly confidential information regarding bristles provided by Rainworks to Mill-Rose in 1997 was in the public domain prior to the time GPI contacted Mill-Rose in late 2002, thus was not considered confidential information pursuant to Clause 7 of the CDA.

**b.     Application of Sealant to Ends  
of the Hedgehog™ Gutter Filter**

Testimony by Thomas Duffy ("Duffy") indicates that P.K. Hergt allegedly came up with the idea to apply sealant to the gutter brush ends in 2001, not Plaintiffs. (Ex. V at 84:22-85:12). Furthermore, gutter filters having end sealants were advertised and sold in the United States under the GUTTERPILLER brand since 2001. (Ex. V at 84:22-85:9; Ex. W). The use of a sealant on the end of a brush was also well known in the art long before Rainworks contacted Mill-Rose in 1997. (Ex. X at 143:7-144:10-15; Ex. U).

In summary, any supposedly confidential information regarding the use of a sealant on the ends of a gutter filter provided by Rainworks to Mill-Rose in 1997 was in the public domain prior to the time GPI contacted Mill-Rose in late 2002, thus, cannot be considered confidential information in light of Clause 7 of the CDA.

20

c.   **Lateral Trimming of the Hedgehog™ Gutter
Filter and a Method for Lateral Trimming**

The sample Hedgehog™ gutter filter provided to Mill-Rose in 1997 (Ex. N) was accompanied with a product brochure (Ex. B) and a letter dated March 12, 1997 (Ex. I) that described the features of the Hedgehog™ gutter filter. Several months after the sample Hedgehog™ gutter filter was provided to Mill-Rose, Rainworks' patent application for a gutter filter issued in the United States as the '068 patent. (Ex. A). The '068 patent disclosed a gutter filter having lateral trimming. It is well established that information disclosed in a patent is in the public domain and can no longer be considered a trade secret. *Scharmer v. Carrollton Mfg. Co.*, 525 F.2d 95, 99 (6th Cir. 1975). The issuance of the '068 patent on July 15, 1997 resulted in public disclosure in the United States of a gutter filter having lateral trimming. As such, pursuant to Clause 7 of the CDA, the concept of laterally trimming a gutter filter was not confidential information after July 15, 1997.[7]

Plaintiffs also asserted that confidential information was conveyed to Mill-Rose regarding the method of manufacturing a laterally trimmed gutter filter. This assertion by Plaintiffs is contrary to the evidence and testimony of record. Plaintiffs acknowledged that the sample of the Hedgehog™ gutter filter provided to Mill-Rose was a "crudely made lop-sided bottle brush" manufactured by a manually operated machine. (Ex. I). Plaintiffs envisioned that by using Mill-Rose's expertise in brush manufacturing, the Hedgehog™ gutter filter could be manufactured by fully automated machines. (Ex. I). Plaintiffs also testified that in 1997 Mill-Rose was the largest brush manufacturer

---

[7]Plaintiffs testified that they created a publicly available website in 2001 which advertised Rainworks' gutter filter products. (Ex. L at 98:4-17, 224:3-18). The website disclosed Plaintiffs' laterally trimmed gutter filters. (Ex. C). Plaintiffs' website is further evidence that laterally trimmed gutter filters were in the public domain prior to the time Mill-Rose began manufacturing gutter filters for GPI in late 2002-early 2003.

in the world and had a "degree of sophistication" that Plaintiffs had never seen before. (Ex. L at 234:10-235:14). Plaintiffs also admitted that any number of brush companies had the knowledge and technology to manufacture the Hedgehog™ gutter filter. (Ex. I).

Moreover, Plaintiffs have not produced any documentary evidence or testimony which establishes that any type of manufacturing information was provided to Mill-Rose which was not already known to Mill-Rose. Indeed, Plaintiffs approached Mill-Rose in the hopes that Mill-Rose could use its expertise in the field of brush making to manufacture the Hedgehog™ gutter filter on an automated machine.

Furthermore, Mill-Rose never manufactured a gutter filter having a lateral trim for Plaintiffs or GPI. (Ex. X at 34:17-35:11, 144:8-12, 146:21-147:2; Ex. U). Plaintiffs even testified that when Mill-Rose manufactured samples for the 1997 Chicago Hardware show, the samples did not include a lateral trim. (Ex. L at 114:17-17:3, 249:3-250:20). The testimony by Mill-Rose confirmed this fact. (Ex. X at 136:15-21). Duffy has also testified that he has never sold a trimmed gutter filter. (Ex. V at 126:21-23).

The fact that Mill-Rose has never manufactured a laterally trimmed gutter filter establishes that Mill-Rose did not use or misappropriate any type of confidential information from Plaintiffs regarding the manufacture of laterally trimmed gutter filters.

In summary, there is no evidence of record establishing that Mill-Rose a) ever manufactured a gutter filter having a lateral trim and b) disclosed, used or misappropriated any manufacturing techniques from Plaintiffs regarding the manufacture of any type of gutter filter, much less a laterally trimmed gutter filter. As such, since laterally trimmed gutter filters were in the public domain prior to the time GPI contacted Mill-Rose in late 2002, laterally trimmed gutter filters were not

22

confidential information pursuant to Clause 7 of the CDA.

### d. Profile Packaging, Carton Loading, Use of Horizontal Hoppers, Fixing System and Branding and Bar Coding

The evidence of record establishes that Rainworks did not provide Mill-Rose with any type of information regarding a) profile packaging information (Ex. U), b) packaging information that involved carton loading (Ex. U), c) the use of horizontal hoppers (Ex. U), d) the use of a fixing system, such as fine gauge wire, to secure the gutter filters in awkward locations on the roof of a building (Ex. U), and e) the use of color coded plastic tags that included a slotted keyhole which attached easily to the wire core of the gutter filter.

Plaintiffs characterized the alleged confidential profile packaging as packing gutter filters in mirror image layers so as to reduce freight costs. (Ex. J - Interrogatory No. 1). There is no evidence of record that the sample Hedgehog™ gutter filter provided by Plaintiffs to Mill-Rose was packaged in any particular manner. Indeed, Plaintiffs only sent Mill-Rose a single sample of a Hedgehog™ gutter filter (Ex. N), thus profile packaging of such sample could not have existed.

Plaintiffs, in a letter to Mill-Rose dated April 15, 1997 (Ex. O), made reference to packaging the Hedgehog™ gutter filter in a three pack or a single pack; however, there is no mention of profile packaging or any advantage to package the Hedgehog™ gutter filter in a certain manner to save costs. Plaintiffs testified that packaging was never supplied to Mill-Rose. (Ex. L at 245:15-246:7).

Plaintiffs characterized the alleged confidential carton loading information as relating to 1) bulk consignments of 3ft. long gutter filters packed vertically in end opening cartons, and 2) the use of a hinged cradle to stack the gutter filters horizontally and to facilitate in inserting the stacked gutter filters into the cartons. (Ex. J - Interrogatory No. 1). There is no evidence of record that

23

information regarding carton loading of the gutter filters was ever provided by Rainworks to Mill-Rose. As stated above, a single sample of a Hedgehog™ gutter filter was provided by Rainworks to Mill-Rose in 1997. This sample Hedgehog™ gutter filter was not packaged in any particular manner. As mentioned previously, the only evidence of record regarding packaging was contained in a letter from Plaintiffs to Mill-Rose dated April 15, 1997 (Ex. O) that made a brief reference to packaging the Hedgehog™ gutter filter in a three pack or a single pack. There is no mention in the April 15th letter of carton loading of 3 ft. long Hedgehog™ gutter filters, nor is there any mention of a hinged cradle device that can be used to bulk stack and package Hedgehog™ gutter filters. Plaintiffs also testified that packaging was never supplied to Mill-Rose. (Ex. L at 245:15-246:7). There is also no evidence of record that Mill-Rose vertically packs 3ft. long gutter filters in end opening cartons by use of a hinged cradle.

There is no evidence of record that Plaintiffs provided Mill-Rose with any type of information regarding horizontal hoppers. There is also no evidence of record that Mill-Rose uses any type of horizontal hopper to package or store any type of gutter filter.

There is no evidence of record that Rainworks provided Mill-Rose with any type of fixing system or information regarding a fixing system in 1997. Mill-Rose is unaware of receiving any type of information from Plaintiffs regarding a fixing system. (Ex. U). There is also no evidence of record that Mill-Rose ever made or used any type of fixing system for GPI that had anything to do with the use of a fine gauge wire, or to secure gutter filters in awkward locations on a roof of a building.

Rainworks asserted that Mill-Rose was provided confidential information regarding color coded plastic tags that included a slotted keyhole which attached easily to the wire core of the gutter

filter and that these colored tags included information and markings that enabled the tags to be scanned at checkout, provide safety information about the gutter filters, and provide information on the best type of gutter filter for a particular use. (Ex. J - Interrogatory No. 1). There is no evidence of record that Rainworks provided any type of branding or bar coding information to Mill-Rose in 1997. The only type of marketing information that Rainworks provided to Mill-Rose was a brief statement in a letter dated April 15, 1997 (Ex. O) regarding possible packaging of the Hedgehog™ gutter filters. Rainworks had received some packaging advice from an ACE hardware contact and then conveyed such advice to Mill-Rose. The concept of using tags was not mentioned in such letter.

Herdman indicated in a facsimile dated July 21, 1997 (Ex. Y) that he would bring some print ready promotional material with him during his visit with Mill-Rose; however, Mr. Herdman testified that he was not even sure that any type of promotional material was actually brought with him during his visit to Mill-Rose in 1997 or used at the 1997 Chicago Hardware show. (Ex. L at 251:16-253:9). Additionally, there is no evidence of record that such promotional material had anything to do with color coded plastic tags.

There is also no evidence of record that Mill-Rose has ever made or used color coded plastic tags for any type of gutter filters. Indeed, Mill-Rose has never made or used color coded plastic tags for any type of gutter filters. (Ex. U). There is no evidence of record Mill-Rose misappropriated, disclosed or used any confidential information provided by Plaintiffs to Mill-Rose.

For the reasons set forth above, Mill-Rose is entitled to summary judgment that it did not violate any provision of the CDA.

## VI.   MILL-ROSE DID NOT TORTIOUSLY INTERFERE WITH A CONTRACT

### A.   Tortious Interference Standard

The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another. *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14, 651 N.E.2d 1283, 1294 (Ohio 1995); *Chesher v. Neyer*, 392 F.Supp.2d 939 (S.D.Ohio 2005).

The elements of tortious interference with contract are as follows: 1) the existence of a contract, 2) the wrongdoer's knowledge of the contract, 3) the wrongdoer's intentional procurement of the contract's breach, 4) the lack of justification, and (5) resulting damages. *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863 (Ohio 1995).

Plaintiffs must show that Mill-Rose "intentionally and improperly" interfered with its contractual or business relations with another in order to prevail on its claim. *Dryden v. Cincinnati Bell Tel. Co.*, 135 Ohio App.3d 394, 400, 734 N.E.2d 409, 413 (Ohio Ct. App. 1999). A mere assertion of wrongdoing without support does not create a genuine issue of material fact. *Landskroner v. Landskroner*, 2005-Ohio-4582 (Ohio Ct. App. 2005).

**B.     History of Contract**

Rainworks asserted that it entered into a License Agreement with Amerisales in June 2000. (Ex. Z). The License Agreement set forth several conditions regarding minimum royalties to be paid to Rainworks by Amerisales, sales of product over the Internet, ownership of at least two brand names, and a confidential information provision.[8]

Less than two (2) years after Rainworks and Amerisales entered into the License Agreement,

---

[8]Amerisales asserted that it never formally entered into the License Agreement with Rainworks since Duffy never signed the License Agreement. (Ex. V at 18:15-19:8).

26

Rainworks informed Amerisales in a letter dated March 14, 2002 (Ex. AA) that the License Agreement would be terminated if Amerisales did not pay the minimum royalties. Rainworks sent Amerisales a formal notice of termination of the License Agreement on April 30, 2002 (Ex. BB). On July 31, 2002, Rainworks sent a letter (Ex. CC) notifying Amerisales that the License Agreement was terminated. Rainworks confirmed the termination of the License Agreement in an August 8, 2002 letter (Ex. DD) and also provided Amerisales an opportunity to reactivate the License Agreement based on several conditions. Negotiations between Amerisales and Rainworks regarding the reactivation of the License Agreement continued into March 2003; however, no further agreements were ever signed between Rainworks and Amerisales.

### C. Mill-Rose's Contact with GPI Occurred After License Agreement Was Terminated

Greg Miller, an employee of Mill-Rose, briefly met Duffy at the Chicago Hardware show during the week of August 11, 2002. (Ex. V at 370:24-371:15; Ex. X at 30:15-32:20; Ex. EE). This meeting between Greg Miller and Duffy took place after Rainworks had terminated the License Agreement with Amerisales.

While GPI and Mill-Rose were engaged in negotiations involving the manufacture of brushes for GPI, Duffy failed to inform Mill-Rose of Amerisales' past relationship with Mr. Herdman or Rainworks. (Ex. X at 30:4-17; Ex. EE). Mill-Rose first learned of Duffy's past relationship with Mr. Herdman and Rainworks upon receiving a letter from Mr. Herdman on April 15, 2003. (Ex. FF; Ex. EE). At this point in time, no evidence of record exists to indicate Duffy and Rainworks were still discussing the reactivation of the License Agreement.

The evidence of record establishes that Mill-Rose did not even contact Duffy regarding

27

brushes for use in gutters until August 2002. As such, a contract did not even exist between Rainworks and Amerisales at the time Mill-Rose first contacted Duffy about the possibility of Mill-Rose manufacturing gutter filters for GPI. Since no contract existed, no tortious interference by Mill-Rose of a contract between Rainworks and Amerisales can be established. *Kenty, supra.*

### D. Mill-Rose Had No Knowledge of Contract

Mill-Rose had no knowledge that any relationship even existed between Amerisales and Rainworks in 2002. (Ex. X at 30:4-17; Ex. EE). In fact, Mill-Rose had no knowledge, until the filing of this civil action that Amerisales and Rainworks continued to have discussions about the License Agreement into 2003. (Ex. EE). Because Mill-Rose had no knowledge of the License Agreement between Amerisales and Rainworks, there was no tortious interference by Mill-Rose of a contract between Rainworks and Amerisales. *Kenty, supra.*

### E. Mill-Rose Did Not Intentionally Procure the Breach of the Contract

The breach of the License Agreement between Rainworks and Amerisales occurred in 2002 when Amerisales did not pay Rainworks the minimum 2001 royalty as required in the License Agreement. (Ex. AA). The alleged breach by Amerisales took place long before Mill-Rose first contacted GPI in August 2002. Mill-Rose had no knowledge that any relationship even existed between Amerisales and Rainworks in 2002. Therefore, because Mill-Rose had no intent to cause Amerisales to breach any provision of the License Agreement with Rainworks, there can be no tortious interference by Mill-Rose of a contract between Rainworks and Amerisales. *Kenty, supra.*

Rainworks has alleged that Mill-Rose should have known that some type of confidentiality agreement existed between Rainworks and Duffy or one or more of Duffy's companies. (Ex. J -

Interrogatory No. 18). The only confidential provision that exists of record between Amerisales and Rainworks is a short "Confidential Information" provision in Section 11 of the License Agreement.[9] The May 14, 2003 letter (Ex. GG) sent by Rainworks to Mill-Rose did not indicate that any type of confidentiality provision had been violated by Duffy or Amerisales, nor did the letter make reference to Section 11 of the License Agreement. The complete License Agreement was not provided to Mill-Rose until Plaintiffs filed a complaint against Mill-Rose in June 2006. (Ex. EE). As such, Mill-Rose had no knowledge of any type of confidentiality provision that existed between Rainworks and Duffy or one or more of Duffy's companies until June 2006. Therefore, Mill-Rose could not have intentionally interfered with a contract between Plaintiffs and Amerisales since Mill-Rose did not even know such contract existed. *Kenty, supra.*

Even if Mill-Rose had some knowledge of the confidentiality provision in Section 11 of the License Agreement prior to June 2006, which it did not, there is no documentary or testimonial evidence of record that such confidentiality provision was ever violated.[10] Section 11 requires that Rainworks and Amerisales agree to keep manufacturing costs and margins confidential. There is no evidence of record that Amerisales ever provided Mill-Rose with such information. As such, there was no breach of the confidentiality provision in Section 11, thus Mill-Rose did not interfere with this provision of the License Agreement.

---

[9]Rainworks' interrogatory response implies that a confidential agreement similar to the one entered into between Mill-Rose and Rainworks also existed between Rainworks and Amerisales. There is no evidence of record establishing that any confidential relationship existed between Amerisales and Rainworks other than the provision set forth in the License Agreement.

[10]Section 11 of the License Agreement does not appear to survive the termination of the License Agreement which occurred in July 2002.

## VII.    CONCLUSION

As established above, this Court should grant summary judgment in Mill-Rose's favor regarding Counts 1, 8 and 12 of the Amended Complaint.  There is no issue of fact that a) Plaintiffs cannot meet their burden under the ordinary observer test or point of novelty test for a finding of infringement of the '068 patent, thus Mill-Rose is entitled to summary judgment of non-infringement, b) the '068 patent fails to satisfy the ornamental requirement as set forth in 35 U.S.C. §171, thus Mill-Rose is entitled to summary judgment of invalidity, c) Herdman knowingly misrepresented his invention before the U.S. Patent and Trademark Office, Mill-Rose is entitled to summary judgment of unenforceability, d) Mill-Rose did not disclose and/or use, without authorization, confidential information relating to the Hedgehog™ gutter filter, nor misappropriate the intellectual property and other rights of the Hedgehog™ gutter filter, thus Mill-Rose is entitled to summary judgment of no breach of contract, and e) Mill-Rose did not intentionally interfere with a contract between Rainworks and Amerisales, thus Mill-Rose is entitled to summary judgment of no tortious interference with contract.

Respectfully submitted:

/s/Brian E. Turung
Brian E. Turung (0052034)
Jude A. Fry (0053651)
FAY SHARPE LLP
1100 Superior Avenue, 7th Floor
Cleveland, Ohio 44114-2579
Phone:  (216) 861-5582
Fax:     (216) 241-1666
E-Mail:  bturung@faysharpe.com
              jfry@faysharpe.com

Attorneys for Defendant
The Mill-Rose Company

30

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2007, a copy of **DEFENDANT THE MILL-ROSE COMPANY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT, INVALIDITY, AND UNENFORCEABILITY OF THE '068 DESIGN PATENT; NO BREACH OF CONTRACT; AND NO TORTIOUS INTERFERNCE WITH CONTRACT** and supporting exhibits were filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>/s/Brian E. Turung</u>
BRIAN E. TURUNG

31

**EXHIBIT LIST**

| | |
|---|---|
| Exhibit A | U.S. Patent No. Des. 381,068 issued July 15, 1997 |
| Exhibit B | Brochure for the Hedgehog™ gutter filter |
| Exhibit C | Pages from the website of Rainworks Ltd. Regarding the Hedgehog™ gutter filter |
| Exhibit D | Rainworks Ltd. advertising material regarding the Hedgehog™ gutter filter |
| Exhibit E | Fax dated November 15, 1997 from Rainworks Ltd. to Thomas Duffy |
| Exhibit F | Letter dated January 3, 2001 from Rainworks Ltd. to Amerisales, Inc. |
| Exhibit G | Photographs of the accused Mill-Rose brush |
| Exhibit H | Relevant Prior Art Brush References – (US 201,688; US 488,784; US 871,786; US 1,735,277; US 1,806,520; US 2,041,985; US 2,339,123; GB 537,017; DE 2,716,101; and EP 0456402) |
| Exhibit I | Letter dated March 12, 1997 from Rainworks Ltd. to Victor Miller |
| Exhibit J | Plaintiffs' Answer to Mill-Rose First Set of Interrogatories Nos. 1, 3, 11, and 18 |
| Exhibit K | Declaration of Michael L. Herdman during prosecution of the '068 patent |
| Exhibit L | Selected pages from the Deposition of Michael L. Herdman |
| Exhibit M | Confidential Disclosure Agreement between Rainworks Ltd. and The Mill-Rose Company dated February 26, 1997 |
| Exhibit N | Photographs of the Hedgehog™ gutter filter |
| Exhibit O | Letter dated April 15, 1997 from Rainworks Ltd. to Mill-Rose Brush Company |
| Exhibit P | Letter dated April 28, 1997 from Rainworks Ltd. to Mill-Rose Brush Company |
| Exhibit Q | Facsimile dated June 19, 1997 from The Mill-Rose Company to Rainworks Ltd. |
| Exhibit R | Facsimile dated June 24, 1997 from The Mill-Rose Company to Rainworks Ltd. |
| Exhibit S | Letter dated June 23, 1997 from Rainworks Ltd. to The Mill-Rose Company |

Exhibit T      Facsimile dated August 26, 1997 from Rainworks Ltd. to The Mill-Rose Company

Exhibit U      First Declaration of Paul Miller with attached Exhibits A-D

Exhibit V      Selected pages from the Deposition of Thomas J. Duffy

Exhibit W      Facsimile dated July 2, 2002 from Wilmington Inc. to Rainworks Ltd.

Exhibit X      Selected pages from the Deposition of Paul Miller

Exhibit Y      Facsimile dated July 21, 1997 from Rainworks Ltd. to The Mill-Rose Company

Exhibit Z      License Agreement date June 23, 2000 between Rainworks Ltd. and Amerisales Inc.

Exhibit AA      Letter dated March 14, 2002 from Rainworks Ltd. to Tom Duffy

Exhibit BB      Letter dated April 30, 2002 from Rainworks Ltd. to Amerisales, Inc.

Exhibit CC      Letter dated July 31, 2002 from Rainworks Ltd. to Amerisales, Inc.

Exhibit DD      Letter dated August 8, 2002 from Laurie Dee of Rainworks Ltd. to Amerisales, Inc.

Exhibit EE      Declaration of Paul Miller with attached Exhibits A-C

Exhibit FF      Letter dated April 15, 2003 from Rainworks Ltd. to The Mill-Rose Company

Exhibit GG      Letter dated May 14, 2003 from Rainworks Ltd. to The Mill-Rose Company